UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SCOTTSDALE INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | |
| V. | § § | Civ. Action No. 4:11-cv-01184 |
| THE SALLY GROUP, LLC d/b/a RIO 24 CIGARS AND PREMIER BAR, | § § § § | |
| Defendant. | § § | |

## MEMORANDUM AND ORDER

Before the Court is Plaintiff Scottsdale Insurance Company's Motion for Summary Judgment ("Motion"). (Doc. No. 11.) After considering the Motion, all responses and replies thereto, and the applicable law, the Court concludes that the Motion should be **GRANTED**.

### I. FACTS

Invoking this Court's diversity jurisdiction, Scottsdale Insurance Company ("Scottsdale" or "Plaintiff") brought this lawsuit against The Sally Group LLC d/b/a Rio 24 Cigars and Premier Bar ("Rio 24" or "Defendant") seeking Declaratory Relief pursuant to § 2201 of the Federal Civil Judicial Procedure and Rules. Scottsdale issued Policy Number CPS1256190 (the "Policy"), effective July 27, 2010 to July 27, 2011, to the named insured, Rio 24. (Doc. No. 1, Complaint ¶ 5.) Rio 24 owned a cigar bar located at 24 Waterway, 110 The Woodlands, Texas. According to Rio 24, its humidor did not function as intended from the inception of its business on July 10, 2009. (*Id.*) This problem allegedly continued until the business closed on November 22, 2010. (*Id.*) The

1

improper functioning of the humidor led to humidity levels outside of tolerance for the cigars stored at Rio 24's business. (*Id.*)

When Rio 24 employees observed mold in the humidor, the landlord ordered the destruction of Rio 24's inventory. (*Id.*) Scottsdale avers that the extreme fluctuations of humidity levels did not result from the breaking apart or mechanical breakdown of a component of the humidifier. (*Id.*) Rather, Scottsdale contends, the improper humidification was either the result of improper design of the humidifier, improper installation of the regulator to the humidifier, improper design and construction of the ductwork servicing the humidifier, or a combination of all of these factors. (*Id.*)

Furthermore, Scottsdale contends, Rio 24's insurance policy lapsed for approximately one month—from June 30 to July 27, 2010. (*Id.* ¶ 7.) Accordingly, Scottsdale argues, the loss to the property from the improper humidity began before the second policy incepted. (*Id.*) Therefore, Scottsdale insists, the loss did not "commence" within the Policy Period, a condition precedent to coverage, as included in the Commercial Property Conditions Form. (Ex. B, Scottsdale Insurance Policy CPS1256190, at Appx. 145.) Additionally, pursuant to the insuring agreement of the Building and Personal Property Coverage Form, Scottsdale agreed to "pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." (Compl. ¶ 8.) According to the Policy, Covered Property, as used in the Coverage Part, includes tenant betterments and improvement made by Rio 24 to business personal property, but not to the structure. (*Id.* ¶ 9.) Scottsdale alleges that the Coverage Form also requires that the loss be caused by a Covered Cause of Loss, as shown in the Supplemental Declarations at

Form CPS-SD-1(9-00). (*Id.* ¶ 10.) The Commercial Property Coverage Part Supplemental Declarations lists the Covered Causes of Loss to be in the "Special" form. (*Id.*) Form CP 10 30 (6-07) Causes of Loss—Special Form, states:

> A. Covered Causes of Loss
>
> > When Special is shown In the Declarations, Covered Causes of Loss means Risks of Direct Physical Loss unless the loss is: 1. Excluded in Section B., Exclusions; or 2. Limited in Section C., Limitations; that follow.

(Scottsdale Insurance Policy CPS1256190, at Appx. 210.) Scottsdale contends that some of these exclusions preclude coverage for Rio 24's loss. (Compl. ¶ 11.) Specifically, Section B, Exclusions describes the following excluded causes of loss:

> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> ….
>
> > h. "Fungus", Wet Rot, Dry Rot And Bacteria
> >
> > Presence, growth, proliferation, spread or any activity of "fungus", wet for dry rot or bacteria.
>
> ….
>
> E. Additional Coverage—Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria
>
> 1. The coverage described in E.2. and E.6. only applies when the "fungus", wet rot or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.
>
> > a. A "specified cause of loss" other than fire or lightning; or

      b. Flood, if the Flood Coverage Endorsement applies to the affected premises.

(Scottsdale Insurance Policy CPS1256190, at Appx. 210.)

      According to Scottsdale, "fungus" includes mold. (Compl. ¶ 13.) Scottsdale insists that the Additional Limited Coverage for mold does not apply here because the mold was not caused by a "specified cause of loss." (*Id.*) The Policy defines "specified causes of loss" as follows:

      G. Definitions

      1. "Fungus" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

      2. "Specified causes of loss" means the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage.

      ….

      c. Water damage means accidental discharge or leakage of water or stream as the direct result of the breaking apart or cracking of a plumbing, heating, air condition or other system or appliance (other than a sump system including its related equipment and parts), that is located on the described premises and contains water or steam.

(Scottsdale Insurance Policy CPS1256190, at Appx. 223.) Scottsdale insists that the problems with the humidification system were not the result of a breaking apart or cracking of the air conditioning system or humidifier. (Compl. ¶ 14.) Thus, Scottsdale concludes, the mold was not caused by and did not result in a specified cause of loss as

defined by the Policy. (*Id.*) Additionally, Scottsdale observes that Form CP 10 30 (6-07)

reflects as follows:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> > d. (1) Wear and tear;
> >
> > ….
> >
> > > (7) The following causes of loss to personal property: (a) Dampness or dryness of atmosphere; (b) Changes in or extremes of temperature; or (c) Marring or scratching.
> >
> > f. Continuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more.
> >
> > ….
> >
> > m. Neglect of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss.
>
> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed In 3.a. through 3.c. results in a Covered Cause of Loss, we will pay or the loss or damage caused by that Covered Cause of Loss.
>
> > ….
> >
> > b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.
> >
> > c. Faulty, inadequate or defective:
> >
> > ….
> >
> > > (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
> > >
> > > (3) Materials used in repair, construction, renovation or remodeling; or
> > >
> > > (4) Maintenance;

of part or all of any property on or off the described premises.

(Scottsdale Insurance Policy CPS1256190, at Appx. 211.) Scottsdale insists that the loss in this case resulted from dampness or dryness of atmosphere; continuous seepage of water or the presence of humidity for more than 14 days; acts or decisions of an individual; and faulty or inadequate design, specifications, workmanship, repair, or construction. (Mot. Summ. Jgmt at 14.)

The Policy also contains the Equipment Breakdown Coverage Endorsement at Form CFS-21s (1-09):

> 1. Section A. Coverage, paragraph 4. Additional Coverage of the BUILDING AND PERSONAL PROPERTY COVERAGE FORM or BUILDERS RISK COVERAGE FORM, whichever applies, is amended to add the following:
>
> Equipment Breakdown
>
> (1) We will pay for direct physical damage to Covered Property that is a direct result of an "accident." The event must be one of the following:
>
> > (a) Mechanical breakdown, including rupture or bursting caused by centrifugal force;
> >
> > (b) Artificially generated electric current, including electric arcing that disturbs electrical devices, appliances or wires;
> >
> > (c) Explosion of steam boilers, steam pipes, steam engines or steam turbines owned or leased by you or operated under your control;
> >
> > (d) Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or
> >
> > (e) Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment.

….

5. With respect to this endorsement, the following definitions apply:

> (a) "Accident" means a fortuitous event that causes direct physical damage to "covered equipment."
>
> ….
>
> (d) "Covered equipment" unless otherwise specified in the Schedule, means Covered Property:
>
> (i) that generates, transmits or utilizes energy, including electronic communications and data processing equipment; or
>
> (ii) which, during normal usage, operates under vacuum or pressure, other than weight of its own contents.

(Scottsdale Insurance Policy CPS1256190, at Appx. 225.) Scottsdale contends that, because the conditions that led to Rio 24's loss were not the result of an "accident" as that term is defined, this endorsement is not triggered to provide coverage. (Compl. ¶ 17.) As none of those events in Sections (1)(a) through (e) occurred here, Scottsdale avers, this endorsement does not provide coverage to this particular loss. (*Id.*)

The Policy further contains a Business Income (And Extra Expense) Coverage Form (Form CP 00 30 06 07), which provides:

> A. Coverage
>
> 1. Business Income
>
> ….
>
> We will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration". The "suspension" must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the

Declarations. The loss or damage must be caused by or result from a
Covered Cause of Loss.

(Scottsdale Insurance Policy CPS1256190, at Appx. 232.) Nonetheless, Scottsdale insists,

this Coverage Form does not provide Rio 24 with relief because the cause of its loss—the

improper installation, construction and design of its humidification system—was not a

Covered Cause of Loss. (Compl. ¶ 19.) Scottsdale further contends that the Building and

Personal Property Coverage Form (CP 00 10 06 07) precludes Rio 24 from obtaining

coverage for its loss. That Section provides:

E. Loss Conditions

The following conditions apply in addition to the Common Policy
Conditions and the Commercial Property Conditions.

….

3. Duties In The Event of Loss Or Damage

a. You must see that the following are done in the event of loss or
damage to Covered Property:

(2) Give us prompt notice of the loss or damage. Include a
description of the property involved.

(3) As soon as possible, give us a description of how, when and
where the loss or damage occurred.

(4) Take all reasonable steps to protect the Covered property from
further damage, … Also, if feasible, set the damaged property
aside and in the best possible order for examination.

….

(6) As often as may be reasonably required, permit us to inspect
the property providing the loss or damage and examine your books
and records.

(Scottsdale Insurance Policy CPS1256190, at Appx. 195.)   In this case, Scottsdale alleges, Rio 24 did not give prompt notice of the loss or damage, did not take all reasonable steps to protect the property from further damage, and did not set aside or permit an independent adjuster on behalf of Scottsdale to examine the damaged property and inventory. (Compl. ¶ 21.) According to Scottsdale, Rio 24 intentionally destroyed its inventory within two to three days of making its claim to Scottsdale and before an independent adjuster could make a site inspection. (*Id.*) As a consequence, Scottsdale explains, only a few samples of damaged cigars remained for the adjuster to view. (*Id.*) Scottsdale insists that Rio 24 was aware of the inconsistent humidity levels in its humidor since July of 2009, and aware of its inventory becoming damaged in November of 2009, about a year before it notified Scottsdale of the loss or damage. (*Id.*) Further, Scottsdale contends, Rio 24 did not take all steps to protect the property from further damage, such as installation of a separate air conditioning system for the humidor's humidifier and removal of the undamaged property before it was confiscated by its lender. (*Id.*)

Accordingly, Scottsdale filed this suit seeking a judgment declaring the rights and duties of the parties. (*Id.* ¶ 24.) Specifically, Scottsdale seeks a declaration of Scottsdale's obligations under the Policy, if any, to Rio 24 following the improper construction, design, and/or installation of the humidification system that caused all of the damages to Rio 24 on or about July 10, 2009 through November 2, 2010. (*Id.*) Scottsdale argues that coverage for Rio 24's claims is not available under the Policy because one or more exclusions apply that preclude coverage. (*Id.* ¶ 25.) The improper humidity levels, Scottsdale asserts, were not the result of a fortuitous event or an "accident" inside the humidifier. (*Id.*)

Rio 24 filed an Answer to Complaint for Declaratory Relief and Counterclaims. (Doc. No. 9.) According to Rio 24, it does not request that Scottsdale cover any premises damage, loss of equipment, or injury to employees or customers; its claim concerns coverage for ongoing business-related expenses it had incurred and would continue to incur in order to mitigate any continuing damages to the business premises. (*Id.* ¶ 26.) At the time Rio 24 reported its claim, there was $100,000 in total business interruption coverage available through the subject policy. (*Id.*) Rio 24 reported its claim to its insurance agent, Hotchkiss Insurance Agency, on November 22, 2010. (*Id.* ¶ 27.) Rio 24 explains that the agent was again contacted the following day, November 23. (*Id.*) Additionally, Rio 24 contends, Michael Wilson ("Wilson"), the principal of Rio 24, spoke directly with Christine Tailford of Scottsdale on November 24, explaining the loss. (*Id.*) Shortly after the claim was reported, Rio 24 avers, Scottsdale sent an adjuster, Rick Sukolics ("Sukolics") to Rio 24's business premises. (*Id.* ¶ 28.) Sukolics then arranged for a mechanical engineer to come to the premises. (*Id.*) Rio 24 accuses Scottsdale of failing to act on its claim for business interruption coverage for five months. (*Id.* ¶ 28.) As a consequence, Rio 24 complains, it:

- Defaulted on its lease agreement with Black Forest Ventures since its monthly rent could not be paid without funding of the business interruption claim;

- Defaulted on a Small Business Administration loan that it could not pay without funding of its business interruption claim;

- Had employee obligations (i.e. wages and benefits) that could not be paid without funding of its business interruption claim;

- Defaulted on an American Express bill in the amount of $29,990.00 that could not be paid without funding of its business interruption claim;

- Could not pay its utility bills without funding of its business interruption claim;

- Had a time-lease obligation from POS Systems that could not be paid without funding of its business interruption claim; and

- Could not meet other business-related invoices and bills without funding of its business interruption claim.

(*Id.* ¶ 29.) In fact, Rio 24 claims, due to Scottsdale's delay in the handling of Rio 24's claim for business interruption coverage and property loss, Rio 24 in fact defaulted on its lease agreement, its Small Business Administration loan, and all other obligations it had. (*Id.* ¶ 30.) As a result, Rio 24 contends, it is now out of business. (*Id.*) According to Rio 24, Scottsdale's conduct resulted in losses to Rio 24 in excess of five million dollars. (*Id.*) Rio 24 brings claims against Scottsdale for breach of contract, under the Texas Insurance Code, under the Prompt Payment of Claims Act, under the Deceptive Trade Practices Act, and for breach of the duty of good faith and fair dealing. (*Id.* ¶¶ 31-43.)

Scottsdale filed a Motion for Summary Judgment. In the Motion, Scottsdale requests (1) that the Court issue a declaration that Scottsdale owes no coverage for Rio 24's claims of business interruption and lost contents under the Policy; and (2) that the Court find that as Scottsdale does not owe coverage for Rio 24's claims, it cannot be in breach of the policy by denying non-covered or excluded claims, or be liable for extra-contractual claims arising from the alleged breach. (Mot. Summ. Jgmt at 9.) In its Response, Rio 24 insists that Scottsdale is not entitled to summary judgment because there exists a genuine issue of material fact regarding coverage. (Doc. No. 13, Resp. to Mot. Summ. Jgmt ¶ 11.) Alternatively, Rio 24 argues, an ambiguity exists in the Policy regarding business interruption coverage. (*Id.*) Therefore, Rio 24 asserts, the Policy language should be construed so as to afford coverage to Rio 24. (*Id.*)

11

**II. LEGAL STANDARD**

To grant summary judgment, the Court must find that the pleadings and evidence show that no genuine issue of material fact exists, and therefore the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The party moving for summary judgment must demonstrate the absence of any genuine issue of material fact; however, the party need not negate the elements of the nonmovant's case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1997). "Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). If the moving party meets this burden, the nonmoving party must then go beyond the pleadings to find specific facts showing there is a genuine issue for trial. *Id.* "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted). "Where the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' no genuine issue of material fact can exist." *Nichols*, 395 F.3d at 186 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**III. ANALYSIS**

This Court interprets insurance contracts using Texas' general rules of contractual interpretation. *Jimenez v. State Farm Lloyds*,  968 F.Supp. 330, 332 (W.D. Tex. 1997) (citing *Const. State Ins. Co. v. Iso-Tex Inc.*, 61 F.3d 405 (5th Cir. 1995)). In interpreting the Policy, this Court's primary concern is to give effect to the true intent of Scottsdale and Rio 24. *Burns v. Exxon Corp.*, 158 F.3d 336, 340 (5th Cir. 1998) (citing *Deauville*

*Corp. v. Federated Department Stores, Inc.*, 756 F.2d 1183, 1193 (5th Cir. 1985); *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex. 1996)). To achieve this objective, this Court "must examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003) (citing *R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 518 (Tex. 1980); *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. 1968)). "If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous." *National Union Fire Ins. Co. of Pittsburgh, PA v. CBI Industries, Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Universal C.I.T. Credit Corp. v. Daniel*, 243 S.W.2d 154, 157 (Tex. 1951)). "If, however, the language of a policy or contract is subject to two or more reasonable interpretations, it is ambiguous." *Id.* (citing *Glover v. National Ins. Underwriters*, 545 S.W.2d 755, 761 (Tex. 1977); *Coker*, 650 S.W.2d at 393; *Universal*, 243 S.W.2d at 157).

"Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Id.* (citing *Coker*, 650 S.W.2d at 394; *R&P Enterprises*, 596 S.W. at 518). "Only where a contract is first determined to be ambiguous may the courts consider the parties' interpretation, and admit extraneous evidence to determine the true meaning of the instrument." *Id.* (citing *Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981); *R&P Enterprises*, 596 S.W.2d at 518). If there is no ambiguity, however, "the writing alone will be deemed to express the intention of the parties, and objective intent

rather than subjective intent controls." *Burns v. Exxon Corp.*, 158 F.3d at 340 (citing *Sun Oil Co. (Del.)*, 626 S.W.2d at 728). "If an insurance policy is worded so that it can be given only one reasonable construction, it will be enforced as written." *Jimenez*, 968 F.Supp. at 332 (citing *Const. State Ins. Co.*, 61 F.3d at 405).

The Court finds that a genuine issue of material fact remains as to whether Rio 24's loss qualifies as a known loss in progress. However, there is no genuine issue of material fact as to whether the Policy would provide coverage for Rio 24's loss. Specifically, the record shows that the Policy would not provide coverage even if Rio 24's loss did not qualify as a known loss in progress. As the Policy unambiguously excludes Rio 24's loss from coverage, Scottsdale is entitled to summary judgment as to its declaratory judgment claim. Scottsdale is also entitled to summary judgment as to all of Rio 24's claims against it. Rio 24's breach of contract and Prompt Payment of Claims Act claims are precluded because there was no coverage under the Policy. The common law bad faith claim cannot survive the Motion for Summary Judgment because Scottsdale's conduct was not extreme. Rio 24 cannot prevail on its Texas Insurance Code claims because Scottsdale timely acknowledged the claim and retained an independent adjuster; Rio 24 did not receive a judgment in state court; and Scottsdale did not underpay the claim. Finally, Rio 24's Deceptive Trade Practices Act claims fail because Rio 24 cannot establish that there were misrepresentations, unconscionable acts, or breaches of express or implied warranties.

### A. Coverage For Rio 24's Claims

*i. Whether Loss was a "Known Loss in Progress"*

Scottsdale contends that Rio 24 cannot recover under the Policy at all because it cannot take out insurance on a "known loss in progress." (Mot. Summ. Jgmt at 17.) According to Scottsdale, the loss is not covered because it is undisputed that the humidor did not function as intended from the inception of business on July 10, 2009 until the business closed on November 22, 2010. (*Id.* at 18.) Scottsdale states that it is also undisputed that "Rio 24 was aware of this loss situation." (*Id.*) Indeed, Wilson testified that he began noticing problems with the humidifier immediately, including over-humidification, under-humidification, and no humidification. (Ex. K to Mot. Summ. Jgmt, Michael F. Wilson Dep. 37:12-17.) The Policy had the effective dates of July 27, 2010 through July 27, 2011. (Ex. B to Mot. Summ. Jgmt, Scottsdale Insurance Policy CPS1256190, at Appx. 132.) Clearly, Scottsdale contends, the loss to the property from improper humidity began before the Policy incepted. (Mot. Summ. Jgmt at 18.)

"Texas has long recognized that it is contrary to public policy for an insurance company knowingly to assume a loss occurring prior to its contract." *Two Pesos, Inc. v. Gulf Ins. Co.*, 901 S.W.2d 495, 500 (Tex.App.-Houston [14 Dist.] 1995, no writ) (citing *Burch v. Commonwealth County Mutual Ins. Co.*, 450 S.W.2d 838, 840-41 (Tex. 1970)). "'[A]n insured cannot insure against something that has already begun and which is known to have begun.'" *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F.Supp.2d 704, 716 (S.D. Tex. 2000) (quoting *Essex Ins. Co. v. Redtail Products, Inc.*, No. Civ.A.3:97–CV–2120–D, 1998 WL 812394, at *4 (N.D. Tex. Nov. 12, 1998)). "A 'known loss' is a loss the insured knew had occurred prior to making the insurance contract." *Maryland Casualty Co. v. South Texas Medical Clinics*, No. 13-06-089-CV, 2008 WL 98375, at *6 (Tex.App.-Corpus Christi Jan. 10, 2008, pet. denied) (citing

*Burch*, 450 S.W. at 838; *Scottsdale Ins. Co v. Travis*, 68 S.W.3d 72, 75 (Tex.App.-Dallas 2001, pet. denied)). "A 'loss in progress' occurs when the insured is, or should be, aware of an ongoing progressive loss at the time the policy is purchased." *Id.* (citing *Scottsdale Ins. Co.*, 68 S.W.3d at 75). In a similar vein, the Policy provides, under Form CG 00 01 12 07:

> 1. Insuring Agreement
>
> ….
>
>> b. This insurance applies to "bodily injury" and "property damage" only if:
>
> ….
>
>>> (2) The "bodily injury" or "property damage" occurs during the policy period; and
>>>
>>> (3) Prior to the policy period, no insured listed under Paragraph 1 of Section III – Who Is An Insured and no "employee" authorized by you to give or receive notice of an "occurrence" or claim, knew that the "bodily injury" or "property damage" had occurred, in whole or in part. If such a listed insured or authorized "employee" knew, prior to the policy period, that the "bodily injury" or "property damage" occurred, then any continuation, change or resumption of such "bodily injury" or "property damage" during or after the policy period will be deemed to have been known prior to the policy period.
>
> ….
>
>> d. "Bodily injury" or "property damage" will be deemed to have been known to have occurred at the earliest time when any insured listed under Paragraph 1 of Section II – Who Is An Insured or any "employee" authorized by you to give or receive notice of an "occurrence" or claim:
>
>>> (1) Reports all, or any part, of the "bodily injury" or "property damage" to us or any other insurer;

(2) Receives a written or verbal demand or claim for damages because of the "bodily injury" or "property damage"; or

(3) Becomes aware by any other means that "bodily injury" or "property damage" has occurred or has begun to occur.

(Scottsdale Insurance Policy CPS1256190, at Appx. 145-46.)

The Court concludes that a genuine issue of material fact remains as to whether Rio 24's loss qualifies, either pursuant to Texas law or to the Policy itself, as a loss that predates the Policy's inception and is therefore uncovered. The record certainly demonstrates that the improper humidity began prior to the Policy's inception. However, the current record before this Court does not show, as Scottsdale contends, that the loss to the property due to that improper humidity began before the Policy incepted. Therefore, Scottsdale is not entitled to summary judgment on the grounds that Rio 24's loss was a "known loss in progress."

### ii. Equipment Breakdown Endorsement

There is not a genuine issue of material fact as to whether Rio 24's claims are covered under the Equipment Breakdown Endorsement. On December 10, 2010, after Rio 24 reported the loss to Scottsdale, Keith O'Neil ("O'Neil") from Chillco Comprehensive Cooling Solutions inspected the loss. (Mot. Summ. Jgmt at 10; Ex. I to Mot. Summ. Jgmt, Keith O'Neil Aff. ¶ 3.) O'Neil concluded that the damages to the cigars and the facility itself were a result of the humidity levels not being maintained on a consistent basis. (*Id.* ¶ 5.) Additionally, O'Neil found, the mold damage was caused by water saturation of the internal insulation in the ductwork. (*Id.*) Further, O'Neil surmised that the saturation was also a result of the inability of the system to maintain proper humidity levels within the humidor—a design deficiency. (*Id.*) In O'Neil's opinion, the

damages did not result from the equipment itself or: (a) Mechanical breakdown, including rupture or bursting caused by centrifugal force; (b) Artificially generated electric current, including electric arcing that disturbs electrical devices, appliances or wires; (c) Explosion of steam boilers, steam pipes, steam engines or steam turbines; (d) Loss or damage to steam boilers, steam pipes, steam engines or steam turbines caused by or resulting from any condition or event inside such equipment; or (e) Loss or damage to hot water boilers or other water heating equipment caused by or resulting from any condition or event inside such boilers or equipment. (*Id.*)

Therefore, the Equipment Breakdown Endorsement Form CFS-21s (1-09) does not provide coverage for Rio 24's loss. (Scottsdale Ins. Policy, at Appx. 225-31.) Specifically, although the humidifier would be "covered equipment" because it utilizes energy, it did not experience any of the "accidents" specified in 1(a) through 1(e). Wilson's testimony supports this interpretation. (Mot. Summ. Jgmt at 11.) Wilson testified:

Q. How did you learn that the regulator was not hooked up?

A. Ron Brown actually told us.

....

Q. [A]s I understand it from what your attorney was describing, it is Mr. Ron Brown's—

A. Right.

Q: —opinion that this controller in the humidor was never hooked up and connected to the Carnes unit that was in the plenum.

A. Correct.

Q. Okay. And it is also his opinion that the humidity that was being produced by the Carnes unit in the plenum was being forced through the ductwork out into the bar area instead of into the humidor.

A. Correct

….

Q. So the humidifier, the Carnes steam humidifying unit, has not operated the way it was intended to operate, has it?

A. No, not the way I intended it to operate.

Q. And it sounds like it was the opinion of Raymark that the way the whole system for the humidor was designed and installed with that humidifying unit being on that one HVAC system was going to keep it from ever working the way you intended it to; is that correct?

A. That's correct.

Q. Okay.

A. Although they did install it.

Q. Although they did install it. But the humidifier itself did not actually have any kind of mechanical breakdown, did it?

A. Not that I know of.

Q. Okay. And it did not have any kind of, like, electrical surge that caused electricity to stop running through it.

A. None that was ever told to me.

(Wilson Dep. 64:12-14; 69:13-24; 62:19-63:13.) Accordingly, a design, construction or installation defect—as opposed to a breakdown of equipment—caused the reported loss. As such, the Equipment Breakdown Endorsement does not provide coverage in these circumstances.

*iii. Building and Personal Property Coverage Form*

Rio 24 also cannot find the relief it seeks under the Building and Personal Property Coverage Form. The Building and Personal Property Coverage Form excludes coverage of loss to personal property due to dampness or dryness of atmosphere; continuous or repeated seepage or leakage of water, or the presence of condensation of humidity, moisture, or vapor, that occurs over a period of 14 days or more; or negligence of an insured to use all reasonable means to save and preserve property from further damage at and after the time of loss. (Scottsdale Insurance Policy CPS1256190, at Appx. 195, 210.) Wilson testified that the fluctuations in humidity levels in the humidor began on July 10, 2009 and continued until November 2010—in excess of 14 days:

> Q. And which was the contractor that installed the humidifier?
>
> A. Apollo Construction was the general contractor. He had a subcontractor. The company was called Raymark, R-A-Y-M-A-R-K, Heating & Air Conditioning. And I believe they installed it.
>
> Q. Do you know when between January and July of 2009 that it was installed?
>
> A. I have no idea.
>
> Q. Okay.
>
> A. There will be construction documents that will have a timeline on that.
>
> Q. All right. And when did you start noticing problems with the humidifier?
>
> A. Immediately.
>
> Q. What was the problems that you were noticing?
>
> A. Over-humidification, under-humidification, no humidification.
>
> ….

Q. So how long did this humidity problem with the over-humidification or under-humidification go on?

A. From Day One when we opened, July 10th, until the day we closed, November 22nd.

(Wilson Dep. 36:25-37:17; 53:23-54:1.) Wilson explained that cigars should be kept at a constant temperature of 70 degrees and a constant humidity of 70 percent. (*Id.* 38:13-20.) According to Raymark, the humidifier was never going to work as installed. (*Id.* 54:11-23.) Since the installation of the humidifier, the humidity levels had ranged from 20 to 95. (*Id.* 39:2-6.) The humidity would sometimes fluctuate by 40 percent within an hour. (*Id.* 42:8-13.) One of Rio 24's employees would make manual adjustments to the humidifier. (*Id.* 43:6-44:15; 47:7-17; 48:21-49:3.) Despite the manual adjustments, however, keeping the humidity levels at 70 percent "was a constant battle." (*Id.* 52:11-12.) In fact, the manual adjustments actually changed the humidity levels in the bar, not in the humidor:

Q: Now, as I understand from what your attorney was describing, it is Mr. Ron Brown's—

A. Right

Q. –opinion that this controller in the humidor was never hooked up and connected to the Carnes unit that was in the plenum.

A. Correct.

Q. Okay. And it is also his opinion that the humidity that was being produced by the Carnes unit in the plenum was being forced through the ductwork out into the bar area instead of into the humidor.

A. Correct.

Q. So the adjustments to the Carnes unit and the plenum were really adjusting the humidity levels in the bar, not in the humidor.

A. And I know this third-hand only because I have not read Brown's report. However, what I can say is, yes. So essentially what we figured out was going on is we're humidifying this whole bar and getting it in the doorway. And so when Robert[, a Rio 24 employee,] would go up there and adjust it to a high level, where we could see it was coming through this vent—and you could see—some would come through the vent. I mean, it wasn't zero.

Q. Uh-huh.

A. But some would come through the vent that we were getting it through the doorway and everything like that. Now, I'm saying that. We figured that out after understanding what was going on and Ron Brown explains.

(*Id.* 69:13-70:19.) At times, the humidity levels would become so high that condensation would begin to form and "would pour down," staining the Spanish cedar of the humidor and ruining the cigars. (*Id.* 52:21-53:16.)

Therefore, the record reflects that the Rio 24's loss was caused by "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more." The insurance adjuster's report supports this conclusion. The adjuster wrote:

My investigation showed that the above noted conditions were caused by excessive humidity in the humidor room and not from any water leaks or4 [sic] problems in the humidifying unit itself.

Your Insured, Attorney Trimble and Richard Foster are all in agreement with this determination.

Trimble advises that there have been problems keeping the correct level of humidity in the cigar room that go back to the original installation of the Carnes Steam Humidifier in July of 2009. Mr. Trimble indicates that there have had [sic] numerous visits by the General Contractor and Ray Mark [sic] Heating and Cooling, the installer, trying, unsuccessfully, to correct the problem.

Mr. Foster states that the problems worsen when the outdoor humidity level is high, especially during prolonged periods of rainfall. This kind of weather is common in the Houston area.

Foster told me that during these times, it is not unusual for the humidity in the cigar room to reach such high levels that water condenses on the ceilings and walls and drips down onto the floor.

***

All agree that the problems in the humidor room are the result of high humidity and condensation.

According to your insured, all of the cigars stored in the humidor were ruined by excessive humidity. The leaf wrappers were delaminating and there was some evidence of mold and mildew.

(Ex. G to Mot. Summ. Jgmt, Insurance Adjuster's First Report at 2-3.) As is clear from the record, Rio 24's loss was caused by the presence or condensation of humidity for more than 14 days. Additionally, Rio 24's loss was caused by dampness or dryness of atmosphere. As a consequence, Rio 24's loss is not covered by the Building and Personal Property Coverage Form.

### iv. Business Income (and Extra Expense) Coverage Form

The Business Income (and Extra Expenses) Coverage Form (CP 00 30 06 07) only covers loss or damage "caused by or result[ing] from a Covered Cause of Loss." (Scottsdale Insurance Policy CPS1256190, at Appx. 232-42.) Therefore, the exclusions in the Cause of Loss—Special Form (CP 10 30 06 07) apply. (*Id.* at Appx. 210.) Loss to personal property cannot be recovered if due to dampness or dryness of atmosphere, as occurred in this case. (*Id.* at Appx. 212.) Furthermore, Scottsdale will not pay for loss or damage caused by or resulting from "[c]ontinuous or repeated seepage or leakage of water, or the presence or condensation of humidity, moisture or vapor, that occurs over a

period of 14 days or more." (*Id.*) Both of these scenarios occurred here, thus exempting

Rio 24's loss from coverage. Recovery is also precluded by an additional exclusion in the

Business Income (and Extra Expense) Coverage Form that provides:

> B. Exclusions
>
> ….
>
> 3. We will not pay for loss or damage caused by or resulting from any of the following, 3.a. through 3.c. But if an excluded cause of loss that is listed in 3.a. through 3.c. results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.
>
> > b. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

Rio 24's landlord ordered the destruction of Rio 24's entire inventory, and Rio 24

complied.[1]  Therefore, the loss was caused by the act or decision of a person or

---

[1] Wilson testified:

> Q. Who gave you the notice to close?
>
> A. Landlord.
>
> Q. What was the basis of that notice?
>
> A. We had a finding from a test company, Envirotest, of black mold caused by the humidification system. Being good tenants, because it's the right thing to do, we contacted the landlord to let him know what was going on; and he ordered us closed and inventory destroyed.
>
> ….
>
> Q. You know when the landlord told you that he wanted you to destroy all the inventory in that business why did you not get another opinion regarding whether it needed to be destroyed?
>
> A. Another landlord opinion?
>
> Q. Or just an expert opinion regarding that.
>
> A. Who's the expert landlord? The landlord, the owner of the building, what other opinion would negate that?

organization—namely, Rio 24's landlord. For these reasons, Rio 24 cannot recover under the Business Income (and Extra Expense) Coverage Form.

Rio 24 insists that it does in fact have coverage under a limited provision on fungus, wet rot, dry rot, and bacteria. The Causes of Loss—Special Form contains a section providing additional coverage:

> E. Additional Coverage—Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria
>
> 1. The coverage described in E.2. and E.6. only applies when the "fungus", wet or dry rot or bacteria is the result of one or more of the following causes that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence.
>
>> a. A "specified cause of loss" other than fire or lightning; or
>>
>> b. Flood, if the Flood Coverage Endorsement applies to the affected premises.
>
> 2. We will pay for loss or damage by "fungus", wet or dry rot or bacteria. As used in this Limited Coverage, the term loss or damage means:
>
>> a. Direct physical loss or damage to Covered Property caused by "fungus", wet or dry rot or bacteria, including the cost of removal of the "fungus", wet or dry rot or bacteria;
>>
>> b. The cost to tear out and replace any part of the building or other property as needed to gain access to the "fungus", wet or dry rot or bacteria; and

---

Q. All right. So you were just going to do whatever the landlord said, basically.

A. I was going to do what the landlord commanded me to do under the lease, yes.

Q. Did he cite any lease provision that—

A. No, ma'am.

Q. –that gave him the authority to demand your inventory be destroyed?

A. No ma'am.

(Wilson Dep. 20:13-20; 114:12-115:5.)

c. The cost of testing performed after removal, repair, replacement or
restoration of the damaged property is completed, provided there is a
reason to believe that "fungus", wet or dry rot or bacteria are present.

….

G. Definitions

1. "Fungus" means any type or form of fungus, including mold or mildew,
and any mycotoxins, spores, scents or by-products produced or released by
fungi.

2. "Specified causes of loss" means the following: fire; lightning;
explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil
commotion; vandalism; leakage from fire-extinguishing equipment;
sinkhole collapse; volcanic action; falling objects; weight of snow; ice or
sleet; water damage.

….

c. Water damage means accidental discharge or leakage of water or
steam as the direct result of the breaking apart or cracking of a
plumbing, heating, air condition or other system or appliance (other
than a sump system including its related equipment and parts), that is
located on the described premises and contains water or steam.

(Scottsdale Insurance Policy CPS1256190, at App. 223.) Rio 24 argues that the mold

discovered on its business premises resulted from leakage from the duct work in the

ceiling above the humidor area. (Resp. to Mot. Summ. Jgmt ¶ 13.) According to Rio 24,

this leakage was accidental and was caused by the "breaking apart" of its air conditioning

system. (*Id.*) As a consequence of the mold, Rio 24 avers, it was required to close its

business operation. (*Id.* ¶ 14.) Rio 24 asserts that coverage of its loss exists or, at a

minimum, the Policy is ambiguous. (*Id.*)

Rio 24 presents no evidence beyond the Policy itself. As such, Rio 24 offers no support for its contention that the leakage was accidental and was caused by the breaking apart of the air conditioning system. There is no evidence in the record that the air conditioning system itself leaked or that it broke apart. Rather, the facts support Scottsdale's position that the mold was caused by high humidity and condensation due to the fact that the humidifier had been incorrectly assembled. Rio 24 presents no genuine issue of material fact as to whether Scottsdale owes proceeds to Rio 24 for business interruption. Therefore, Scottsdale is entitled to summary judgment as to its claim for declaratory judgment.

### B. Rio 24's Counterclaims

Under Texas law, "'[a]n insured is not entitled to recover under an insurance policy unless it proves its damages are covered by the policy.'" *Simco Enterprises, Ltd. v. James River Ins. Co.*, 566 F.Supp.2d 555, 567 (E.D. Tex. 2008) (quoting *Comsys Information Technology Services, Inc. v. Twin City Fire Ins. Co.*, 130 S.W.3d 181, 198 (Tex.App.-Houston [14 Dist.] 2003, pet. denied)). *See also Lambrecht & Associates, Inc. v. State Farm Lloyds*, 119 S.W.3d 16, 27 (Tex.App.-Tyler 2003, no pet.) ("In order to recover under an insurance policy, an insured must prove that the loss was covered by the policy." (citing *Employers Casualty Co. v. Block*, 744 S.W.2d 940, 945 (Tex. 1988))). As Rio 24's damages are not covered by the Policy, Scottsdale is entitled to summary judgment as to Rio 24's breach of contract claim. Likewise, "'[a]s a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered.'" *Crocker v. Am. Nat. Gen. Ins. Co.*, 211 S.W.3d 928, 936 (Tex.App.-Dallas 2007, no pet.) (quoting *Republic Ins. Co. v. Stoker*, 903 S.W.2d 339, 341 (Tex. 1995)).

"Texas insurance law generally conditions recovery for bad faith and extracontractual claims on a recovery for breach of the insurance contract itself." *Smith v. Allstate Ins.*, No. H-03-0651, 2007 WL 677992, at *5 (S.D. Tex. Feb. 27, 2007) (citing *Progressive County Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005); *Liberty Nat'l Fire Ins. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) (no bad-faith liability because the insurance policy did not provide coverage and the plaintiff did not plead additional damages unrelated to the denial of coverage); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995) (same)). However, the Texas Supreme Court has "left open the possibility that an insurer's denial of a claim it was not obligated to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim." *Boyd*, 177 S.W.3d at 804. *See also Smith*, 2007 WL 677992, at *5 ("A bad faith claim may survive a no-coverage finding if the insurer's conduct was extreme and produced damages unrelated to and independent of the policy claim." (citing *Am. Motorists Ins. Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001); *Stoker*, 903 S.W.2d at 341)).

However, there is no genuine issue of material fact as to whether Scottsdale's conduct was "extreme." Scottsdale sent Rio 24 a written acknowledgement of its claim within one day of receiving the notice of loss. (Ex. C to Mot. Summ. Jgmt, Property Loss Notice, at Appx. 260; Ex. D to Mot. Summ. Jgmt, November 24, 2010 Letter from Scottsdale to Rio 24, at Appx. 261.) Within six days of receiving notice of the loss, the independent adjuster contacted Rio 24's attorney to set up an inspection; the actual inspection was conducted two days later. (Insurance Adjuster's First Report, at Appx. 264.) In March 2011, Scottsdale informed Rio 24's counsel of the need to take the

examination under oath of Wilson. (Ex. J to Mot. Summ. Jgmt, March 10, 2011 Letter from Scottsdale's Counsel to Rio 24's Counsel, at Appx. 321.) Within seven days of taking Wilson's deposition, Scottsdale sent correspondence to Rio 24's counsel denying the claim. (Ex. L to Mot. Summ. Jgmt, March 31, 2011 Letter from Scottsdale's Counsel to Rio 24's Counsel, at Appx. 373.) Rio 24 has put forth no evidence of "extreme" conduct by Scottsdale. As such, Rio 24's bad faith claim cannot survive the Motion for Summary Judgment.

Rio 24 also alleges that Scottsdale violated Chapter 542.003 of the Texas Insurance Code by:

- Failing to adopt and implement reasonable standards for the prompt investigation of a claim arising under the insurance policy;

- Not attempting in good faith to affect a prompt, fair and equitable settlement of the claim submitted in which liability has become reasonably clear;

- Compelling the policy owner to proceed with the institution of a lawsuit to recover an amount under the policy by offering substantially less than the amount ultimately recovered in the suit brought by the policyholder.

(Answer and Counterclaims ¶ 34.) Moreover, Rio 24 contends, Scottsdale acted in bad faith in denying Rio 24's insurance benefits. (*Id.*) Rio 24 additionally brings allegations under the Prompt Payment of Claims Act. (*Id.* ¶ 36.)

There is no genuine issue of material fact as to any of Rio 24's claims under the Texas Insurance Code. First, the evidence shows that Scottsdale in fact promptly investigated Rio 24's claim. Second, as set forth above, Rio 24 cannot establish that Scottsdale acted in bad faith. Third, Rio 24 has not recovered in a suit against Scottsdale, and the evidence shows that Scottsdale did not underpay the claim. Fourth, Rio 24 cannot

bring any allegations under the Prompt Payment of Claims Act because its claims were not covered by the Policy. *Boyd*, 177 S.W.3d at 922 ("There can be no liability under article 21.55 if the insurance claim is not covered by the policy."). *See also Ewing Const. Co., Inc. v. Amerisure Ins. Co.*, 814 F.Supp.2d 739, 753 (S.D. Tex. 2011); *Nat. Union Fire Ins. Co. of Pittsburgh, PA v. McMurray*, 342 Fed.Appx. 956, 960 (5th Cir. 2009) (unpublished) ("Under the prompt payment of claims provision, there can be no liability unless the insurance claim should have been paid."); *Kaufman and Broad Home Corp. v. Employers Mut. Cas. Co.*, No. 2-06-383-CV, 2008 WL 281530, at *9 (Tex.App.-Fort Worth Jan. 31, 2008, no pet. h); *Schober v. State Farm Mut. Auto. Ins. Co.*, No. 3:06-CV-1921-M, 2007 WL 2089435, at *3 (N.D. Tex. July 18, 2007). Fifth, Rio 24 has not presented any fact establishing that Scottsdale failed to meet the requirements of the Prompt Payment of Claims Act; indeed, as outlined above, the record demonstrates that Scottsdale did meet the Act's timing requirements.

Finally, Rio 24 alleges that Scottsdale violated the Deceptive Trade Practices Act. Specifically, Rio 24 claims that Scottsdale violated § 17.46(b) of the Act by:

- Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses or benefits or qualities that they do not have …

- Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another …; and

- Representing that a contract confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law.

(Answer and Counterclaims ¶ 39.) Rio 24 brings two additional DTPA Claims: A claim for unconscionable action or course of action under § 17.50(a)(3); and for breach of express or implied warranty pursuant to § 17.50(a)(2). Even viewing the record in the

light most favorable to Rio 24, however, Rio 24 cannot establish a genuine issue of material fact as to its DTPA claims. There is no evidence that Scottsdale made any misrepresentations, or engaged in unconscionable actions. Nor is there evidence of breach of an express or implied warranty. Therefore, Scottsdale is entitled to summary judgment as to Rio 24's DTPA claims.

### IV. CONCLUSION

For the reasons explained in this Memorandum and Order, Scottsdale's Motion for Summary Judgment is hereby **GRANTED.**

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 3rd day of April, 2012.

_____
**KEITH P. ELLISON**
**US DISTRICT COURT JUDGE**